## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **TERESA ROSEBERRY,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:10cv00081 |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **REPORT AND RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Teresa Roseberry, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

-1-

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Roseberry filed previous applications for DIB and SSI on July 11, 2005. (R. at 9.) An administrative law judge, ("ALJ"), issued an unfavorable decision on March 29, 2007. (R. at 9.) Roseberry's request for review was denied by the Appeals Council on May 8, 2008. (R. at 9.) Roseberry protectively filed her current applications for DIB and SSI on April 3, 2007, alleging disability as of March 30, 2007,[1] due to osteoarthritis, fibromyalgia, manic depression, bipolar disorder, major depressive disorder, recurrent, severe, with psychotic features and panic disorder with agoraphobia. (Record, ("R."), at 179-86, 205, 210, 244.) The claims were denied initially and on reconsideration. (R. at 78-80, 85-87, 91, 93-95, 97-99, 101-04, 106-07, 109-10.) Roseberry then requested a hearing before an ALJ. (R. at 111.) A hearing was held on July 8, 2009, and a supplemental hearing was held on January 14, 2010, at both of which Roseberry was represented by counsel. (R. at 32-70.)

By decision dated February 24, 2010, the ALJ denied Roseberry's claims. (R. at 9-26.) Roseberry amended her alleged onset of disability to March 30, 2007, the day after the date of her prior unfavorable hearing decision. (R. at 9, 34.) The

---

[1] Roseberry initially claimed an onset date of July 11, 2005, but amended the onset date to March 30, 2007, at her January 14, 2010, hearing. (R. at 9, 34.)

ALJ found that Roseberry met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2010. (R. at 12.) The ALJ also found that Roseberry had not engaged in substantial gainful activity since March 30, 2007. (R. at 12.) The ALJ determined that the medical evidence established that Roseberry had severe impairments, namely fibromyalgia, osteoarthritis, major depression, bipolar disorder, panic disorder and anxiety disorder, not otherwise specified, but he found that Roseberry's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 12-19.) The ALJ also found that Roseberry had the residual functional capacity to perform simple, unskilled, nonstressful light work[2] that required no climbing of ladders, ropes or scaffolds, no more than occasional climbing of stairs, balancing, stooping, kneeling, crouching and crawling and no more than frequent use of ramps, which did not require exposure to hazards, such as machinery and heights, and which required no interaction with the public. (R. at 20.) The ALJ also found that Roseberry needed a static work environment. (R. at 20.) Thus, the ALJ found that Roseberry was unable to perform any of her past relevant work. (R. at 24.) Based on Roseberry's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that Roseberry could perform, including jobs as a cleaner, a packer and an inspector/grader. (R. at 25.) Thus, the ALJ found that Roseberry was not under a disability as defined under the Act and was not eligible for benefits. (R. at 26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2011).

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2011).

-3-

After the ALJ issued his decision, Roseberry pursued her administrative appeals, (R. at 4-5), but the Appeals Council denied her request for review. (R. at 1-3.) Roseberry then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2011). The case is before this court on Roseberry's motion for summary judgment filed May 23, 2011, and the Commissioner's motion for summary judgment filed July 21, 2011.

## II. Facts

Roseberry was born in 1958, (R. at 179, 184), which, at the time of the ALJ's decision, classified her as a person "closely approaching advanced age" under 20 C.F.R. §§ 404.1563(d), 416.963(d) (2011). She has a tenth-grade[3] education and past work experience as a janitor, a machine operator in a textile mill and a supervisor at a cleaning service. (R. at 37-39, 211, 214.) The ALJ held a hearing on July 8, 2009, at which time he ordered a consultative psychological examination of Roseberry to better assess the severity of her mental impairments. (R. at 60-70.) A subsequent hearing was held on January 14, 2009. (R. at 32-59.) Roseberry testified that she had been diagnosed with fibromyalgia and osteoarthritis of the hands and knees. (R. at 41.) She stated that she had no grip in both hands most of the time and could not use her knees to squat down. (R. at 41-42.) She estimated that she could stand for 15 to 20 minutes at a time and that she could lift up to 10 pounds off and on for one-third of the workday. (R. at 42-43.) She testified that she could not perform a job requiring her to be on her feet six to

---

[3] Roseberry testified at her hearing that she went to the eleventh grade in school. (R. at 37.)

-4-

eight hours daily. (R. at 46.) Roseberry testified that pain medication helped her fibromyalgia symptoms very little and that she used a heating pad, took hot baths, used ice and had to lie down to try to alleviate her pain. (R. at 42-43, 46.) She stated that she could not complete housework because she had to lie down. (R. at 47.) Roseberry testified that her sister did her grocery shopping and that she did not do any visitation. (R. at 47, 49.) She stated that she tried to attend church services twice weekly, but missed, on average, two services monthly. (R. at 48.) She further stated that although she was able to go out into the community with her daughter as late as December 2008, she could no longer do so due to pain. (R. at 49-50.)

Roseberry also testified that she suffered from depression and crying spells, had experienced hallucinations in the past, had difficulty concentrating and that she had participated in mental health counseling. (R. at 43-46.) She testified that she did not want to be around people and felt anxious. (R. at 45.) She stated that she was taking Cymbalta for depression, Abilify for mood stabilization and amitriptyline as a sleep aid, noting that Abilify helped to quell her crying spells. (R. at 45.) She further testified that, while she had suffered from hallucinations in the past, she did not "have it as bad." (R. at 46.) Roseberry testified that even if her pain was not as bad, she could not work due to difficulty concentrating. (R. at 46.)

Robert Jackson, a vocational expert, also was present and testified at Roseberry's hearing. (R. at 50-58.) Jackson classified Roseberry's past work as a

janitor/cleaner as medium[4] and unskilled and as a supervising cleaner and a textile machine operator as medium and semi-skilled. (R. at 52.) Jackson testified that a hypothetical individual of Roseberry's age, education and work history, who could perform light work that required no more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling, that did not require climbing ladders, ropes or scaffolds and that did not require exposure to hazardous and dangerous moving machinery and heights, could not perform Roseberry's past work, but could perform the jobs of a cleaner, a cashier and a packer. (R. at 52-53.) Jackson stated that the same individual, but who was limited as set forth in the mental assessment completed by Julie Jennings, Ph.D., a state agency psychologist, on March 27, 2008, and who also was limited to the performance of simple, unskilled and nonstressful work, could perform the same jobs. (R. at 54.) Jackson testified that the same individual, but who also should have no interaction with the public, could not perform the job of a cashier, but could perform the job of an inspector/grader in addition to the cleaner and packer jobs. (R. at 54-55.) Jackson stated that the same individual, but who required a static work environment, could perform these same jobs as well. (R. at 55.) Next, Jackson testified that an individual who could sit for a total of only one to two hours could not perform competitive, full-time work. (R. at 55-56.) Likewise, Jackson testified that an individual with the limitations set forth in a physical assessment completed by Suzonne Swihart, a nurse practitioner, on October 23, 2007, could perform no jobs, nor could an individual with the limitations set forth in the mental assessment completed by A. Barrie Bondurant, Ph.D., L.P.C., on December 16, 2009. (R. at

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2011).

-6-

56.)

In rendering his decision, the ALJ reviewed records from Slonaker Medical Associates; Wellmont Holston Valley Medical Center; Holston Medical Group; Dr. James J. Hollandsworth, M.D.; Dr. Robert McGuffin, M.D. a state agency physician; Joseph I. Leizer, Ph.D., a state agency psychologist; Scott County Mental Health Services; Dr. Joseph Duckwall, M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychologist; Free Clinic of Pulaski; New River Valley Community Services; and Angelia Berry, Psy.D., a licensed clinical psychologist.

On March 30, 2007, Dr. James J. Hollandsworth, M.D., Roseberry's primary care physician, deemed her chronic pain stable. (R. at 367.) Roseberry noted some swelling in the hands upon awakening, which Dr. Hollandsworth opined could be due to Mobic, which he reduced. (R. at 367.)

Roseberry was seen at Scott County Mental Health Services, ("SCMHS"), from April 9, 2007, to October 8, 2007, at the urging of her counsel. (R. at 420-93.) On April 9, 2007, Roseberry noted previous outpatient mental health treatment for depression at St. Albans in 1991. (R. at 461-62, 491-92.) She reported hearing voices and feeling like someone was watching her or standing over her, as well as sleep and appetite disturbance. (R. at 491.) Elizabeth Fletcher, MS, diagnosed a depressive disorder, and she assessed Roseberry's then-current Global Assessment of Functioning, ("GAF"),[5] score at 60.[6] (R. at 492.) When Roseberry saw Sandra

---

[5] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and

Rhoton, a case manager, on May 4, 2007, she reported audiovisual hallucinations, stating that she heard people talking when no one was there and saw spiders crawling up the walls. (R. at 459-87.) She reported that she was receiving antidepressants from her primary care physician. (R. at 459.) Roseberry was oriented, her thought processes were intact, and her mood appeared dysphoric, but she was deemed stable. (R. at 459.) Roseberry reported being able to complete all activities of daily living and independent living with no intervention. (R. at 465.) She reported, among other things, social withdrawal, anxiety, jitteriness, panic attacks, avoidance behavior, worrying, distractibility, impaired judgment, memory impairment, poor attention or concentration, flight of ideas, racing thoughts, slurred speech, hallucinations, paranoid ideation, anger, depressed mood, elevated or expansive mood, marked mood shifts, tearfulness and insomnia. (R. at 469-71.) Rhoton diagnosed major depressive disorder, severe, with psychotic features; and panic disorder without agoraphobia; and she placed Roseberry's then-current GAF score at 60. (R. at 475.) Rhoton recommended a psychiatric referral and case management services. (R. at 473-74.)

On May 14, 2007, Roseberry reported doing well with her usual level of functioning. (R. at 456.) She reported no hallucinations, medication compliance without side effects, and she denied an increase in symptoms or stressors. (R. at 456.) Roseberry was alert and oriented with a depressed mood and blunt affect. (R. at 456.) Her thoughts were scattered and unorganized, but there was no

---

occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), at 32 (American Psychiatric Association 1994).

[6] A GAF score of 51 to 60 indicates "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …" DSM-IV at 32.

-8-

evidence of psychosis. (R. at 456.) She appeared clinically stable. (R. at 456.) Roseberry also saw Dr. James Turnbull, M.D., a psychiatrist with SCMHS, the same day. (R. at 457.) Dr. Turnbull described Roseberry as dysphoric and mildly depressed. (R. at 457.) He diagnosed major depressive disorder, severe, with psychosis, he placed her then-current GAF score at 55, and he prescribed Lexapro. (R. at 457.) On June 6, 2007, Roseberry reported not doing well, with a decreased level of functioning, and she reported no difference in symptoms with Lexapro. (R. at 452.) Roseberry reported continued hallucinations, including hearing voices and seeing rats running across the floor. (R. at 452.) However, she did not wish to take any antipsychotic drugs at that time. (R. at 452.) Roseberry was alert and oriented with a dysthymic mood and flat affect, and her thoughts were logical and organized. (R. at 452.) She again was deemed clinically stable. (R. at 452.) Dr. Turnbull asked Roseberry to continue Lexapro for a month at an increased dosage. (R. at 453.) On June 12, 2007, Rhoton completed a DSM-IV Assessment, diagnosing Roseberry with major depressive disorder, severe, with psychotic features; and panic disorder without agoraphobia. (R. at 448.) She placed her then-current GAF score at 60. (R. at 448.)

Roseberry saw Dr. Daniel A. Slonaker, M.D., on June 19, 2007, with complaints of bilateral knee and hip pain. (R. at 500.) Dr. Slonaker diagnosed osteoarthritis of the knees and hips, hypothyroidism and fibromyalgia, and he prescribed Neurontin, Flexeril, meloxicam, Salsalate, Lidoderm Patch and hydrocodone. (R. at 500.) He also ordered x-rays. (R. at 500.)

On June 21, 2007, Dr. Robert McGuffin, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Roseberry,

-9-

finding that she could perform light work with an ability to occasionally perform all postural movements. (R. at 399-405.) He imposed no manipulative, visual or communicative limitations. (R. at 401-02.) Dr. McGuffin found that Roseberry should avoid all exposure to hazards, such as machinery and heights. (R. at 402.)

On the same date, Joseph I. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), concluding that Roseberry suffered from a nonsevere affective disorder and anxiety-related disorder, but that a residual functional capacity assessment was necessary. (R. at 406-19.) Leizer found that Roseberry was mildly restricted in her activities of daily living, had mild difficulties in maintaining social functioning and in maintaining concentration, persistence and pace and had experienced no episodes of decompensation of extended duration. (R. at 416.)

Roseberry continued to treat with Dr. Turnbull and Rhoton from July 2007 through September 2007. (R. at 437-93.) Over this time period, Roseberry continued to report hallucinations, but she consistently denied an increase in symptoms or stressors, and she reported no new psychiatric symptoms. (R. at 437-45.) Roseberry also was consistently deemed clinically stable. (R. at 437, 440-41, 445.) In July 2007, Dr. Turnbull prescribed Cymbalta and Abilify to address Roseberry's psychotic symptoms, which decreased her panic attacks within the month. (R. at 443, 445.) On August 1, 2007, Dr. Turnbull prescribed alprazolam, and later that month, Roseberry reported that medications were working well. (R. at 440, 442.) In August and September 2007, she reported continued visual hallucinations. (R. at 437, 439-41.)

-10-

When Roseberry saw Dr. Slonaker on July 3, 2007, she complained of bilateral shoulder and hand pain, for which he prescribed Elavil and cyclobenzaprine. (R. at 499.) On July 31, 2007, Roseberry complained of bilateral knee pain and hip pain, with the left being worse than the right. (R. at 498.)

X-rays of Roseberry's cervical spine, hands, knees and hips, taken on October 16, 2007, showed significant osteoarthritis of the left hip, deterioration of the left acetabulum, mild osteoarthritis of the right hip, mild osteoarthritis of the hands, significant narrowing of the left knee, mild osteoarthritis of the right knee and mild narrowing of the C3-4, C4-5 and C5-6 disc spaces. (R. at 496.) Roseberry continued treatment with Dr. Slonaker and his associates from October 23, 2007, through December 2, 2008. (R. at 654-82.) On October 23, 2007, Suzonne Swihart, a family nurse practitioner for Dr. Slonaker, completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical), finding that Roseberry could lift a maximum of less than 10 pounds occasionally and less than five pounds frequently. (R. at 293-94, 501-02.) She opined that she could stand, walk and/or sit for a total of one to two hours, but for only 30 minutes without interruption. (R. at 293, 501.) Swihart found that Roseberry could never climb, stoop, kneel, balance, crouch or crawl. (R. at 294, 502.) She found that her abilities to reach, handle, feel, push and pull were affected by her impairments. (R. at 294, 502.) Swihart found that Roseberry was restricted in her ability to work around heights, moving machinery, temperature extremes, noise, humidity and vibration. (R. at 294, 502.) Swihart based these findings on Roseberry's osteoarthritis. (R. at 293-94, 501-02.) She further noted that, due to pain and anxiety and medication therefor, Roseberry would be at risk for decision-making difficulties. (R. at 294, 502.)

-11-

From November 2007 to December 2008, Roseberry continued to report pain. On April 22, 2008, Dr. Slonaker diagnosed thoracic spine pain, shortness of breath, osteoarthritis of the hips and knees and fibromyalgia. (R. at 658.) On June 17, 2008, Roseberry rated her neck, thoracic spine and bilateral knee, hip and hand pain as a two on a five-point scale with medication. (R. at 659.) On August 12, 2008, she reported an inability to bend, squat or go up and down stairs. (R. at 660.) Roseberry also reported anxiety and depression. (R. at 660.) Dr. Slonaker diagnosed cervical spine and thoracic spine pain, osteoarthritis of the hips and knees and anxiety. (R. at 660.) On August 26, 2008, Roseberry reported having gone to the emergency room the previous night for chest pain, left arm and neck pain. (R. at 661.) Dr. Slonaker noted an irregular heartbeat, and he arranged for Roseberry to wear a Holter monitor. (R. at 661.) He diagnosed palpitations and chest pain and stated that he would refer her to a cardiologist. (R. at 661.) On September 9, 2008, Roseberry reported continued chest pain, noting that this was helped, but not totally relieved, by Xanax. (R. at 662.) A September 10, 2008, EKG was abnormal, and Dr. Slonaker prescribed Coreg. (R. at 678-82.) By October 7, 2008, Roseberry reported decreased frequency of chest pain with Coreg, and by November 4, 2008, she reported no chest pain for the previous month. (R. at 663-64.) Dr. Slonaker deemed her chest pain and palpitations stable, and he continued to diagnose osteoarthritis of the hips. (R. at 664.) On December 2, 2008, Roseberry's chest pain and palpitations remained stable with Coreg, but she noted left-sided radiating neck pain, which she rated as a two with medication. (R. at 665.) She reported that she could only perform activities of daily living for 15 minutes before having to rest. (R. at 665.) Dr. Slonaker diagnosed cervical disc disease, tachycardia, palpitations, chest pain and anxiety and depression, and he continued Coreg. (R. at 665.)

-12-

Roseberry continued to treat with SCMHS from October 24, 2007, through March 17, 2008. (R. at 618-27.) On October 24, 2007, Roseberry reported that she was doing much better on her medications, she reported no hallucinations, and she had no complaints. (R. at 627.) Her mood was pleasant and friendly with congruent affect, and there was no evidence of psychosis. (R. at 627.) She was deemed clinically stable. (R. at 627.) Roseberry saw Dr. Turnbull on October 29, 2007, with no complaints. (R. at 626.) From November 21, 2007, through January 29, 2008, Roseberry consistently reported doing well with medications, reporting no hallucinations and no increase in symptoms or stressors. (R. at 621, 626-27.) No evidence of psychosis was found during this time, and Roseberry was consistently described as clinically stable. (R. at 621-24.) On January 29, 2008, Roseberry's dosage of Xanax was decreased in an effort to increase her energy level. (R. at 621.) Although she reported several panic attacks weekly at her February 18, 2008, appointment with Rhoton, she attributed this to the decreased Xanax dosage. (R. at 620.) In any event, she was deemed clinically stable with no evidence of psychosis and received samples of Cymbalta and Abilify. (R. at 620.) By March 3, 2008, Roseberry had returned to her usual level of functioning, stating that the panic attacks had decreased. (R. at 619.) She did report feeling panicky, especially when driving, but stated that she tried to go out with family members at least twice weekly. (R. at 619.) On March 17, 2008, Roseberry reported that cleaning her house helped to relieve stress. (R. at 618.)

On March 25, 2008, Dr. Joseph Duckwall, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, finding that Roseberry could perform light work with an ability to occasionally perform all postural movements. (R. at 503-10.) He imposed no manipulative, visual or

-13-

communicative limitations, but he found that Roseberry should avoid all exposure to hazards, such as machinery and heights. (R. at 505-06.)

On March 27, 2008, Julie Jennings, Ph.D., a state agency psychologist, completed a PRTF finding that Roseberry suffered from an affective disorder and an anxiety-related disorder, but that a residual functional capacity assessment was necessary. (R. at 511-25.) Jennings opined that Roseberry was mildly restricted in her activities of daily living, experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 521.)

Jennings also completed a Mental Residual Functional Capacity Assessment, finding that Roseberry was moderately limited in her abilities to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and to set realistic goals or make plans independently of others. (R. at 526-27.) In all other areas of mental functioning, Roseberry was deemed not significantly limited. (R. at 526-27.) Jennings opined that Roseberry was limited to the performance of simple, unskilled, noncomplex work. (R. at 528.)

Roseberry continued treatment with SCMHS from April 17, 2008, through

-14-

August 11, 2008.  On April 17, 2008, Roseberry saw Dr. Jennifer Wisdom-Schepers, M.D., a physician at SCMHS, reporting that Cymbalta and therapy had been very helpful and that Abilify had helped control psychotic symptoms for the previous four to six months.  (R. at 615.)  She denied any problems, and noted that she took Xanax only as needed for panic attacks.  (R. at 615.)  She presented no evidence of psychosis.  (R. at 615.)  Dr. Wisdom-Schepers found that Roseberry's psychosis was in remission.  (R. at 615.)  She decreased the dosage of alprazolam, and increased the dosage of Cymbalta.  (R. at 615.)  Dr. Wisdom-Schepers opined that treatment was expected to maintain or improve Roseberry's health status or functioning.  (R. at 616.)  On May 22, 2008, Roseberry continued to deny hallucinations, and she denied any increase in symptoms or stressors.  (R. at 613.)  There was no evidence of psychosis, and she was consistently found to be clinically stable through August 11, 2008.  (R. at 608-11, 613.)  In fact, in June 2008, Roseberry could complete activities of daily living independently, and she stated that she could "do without" Xanax.  (R. at 611.)  Dr. Wisdom-Schepers stated that antipsychotics would be discontinued at the next appointment, as her major depressive disorder with psychotic features and panic attacks were in remission.  (R. at 611.)  In July 2008, Roseberry again reported going out twice weekly with family, and in June and July 2008, she described housework as a stress reliever.  (R. at 609-10.)

Roseberry presented to the emergency department at Pulaski Community Hospital on August 23, 2008, with complaints of substernal chest pain.  (R. at 649-53.)  However, a chest x-ray showed no active disease.  (R. at 652.)

Roseberry continued treatment at SCMHS from September 16, 2008,

through January 15, 2009. (R. at 596-606.) On September 16, 2008, she saw Jennifer Boggs, MSN, APRN, reporting increased anxiety and some increased fear/paranoia of bad things happening due to health problems. (R. at 605.) She also reported hearing vague voices again. (R. at 605.) She stated that her primary care physician had reinitiated Xanax to keep her relaxed and not aggravate any cardiac symptoms. (R. at 605.) Abilify was continued given some mild relapse in psychosis. (R. at 605.) On September 29, 2008, Roseberry noted that Xanax helped her anxiety. (R. at 604.) She denied hallucinations, but endorsed paranoia, which caused her to isolate. (R. at 604.) She also reported that, for the previous two weeks, she had been staying with her sister who had undergone open heart surgery. (R. at 604.) Nonetheless, she reported doing "okay" given her stressors. (R. at 604.) She did not appear to be responding to any hallucinations, and she was deemed psychiatrically stable. (R. at 604.) On October 10, 2008, Roseberry reported doing well and noted that she stayed busy as she remained with her sister. (R. at 603.) She reported only going out when she had to due to paranoia while driving. (R. at 603.) She was euthymic with appropriate affect, and she was deemed clinically stable. (R. at 603.) On November 13, 2008, Roseberry reported doing fair with some intermittent depression and occasional panic episodes, mostly controlled by low-dose Xanax. (R. at 600.) She reported an increase in paranoia for the previous three weeks, feeling like someone was behind her all the time, and she reported going out only when necessary. (R. at 602.) She stated that she was no longer staying with her sister. (R. at 602.) She was dysphoric with congruent affect, but there was no evidence of psychosis, and she was deemed clinically stable. (R. at 602.) Roseberry's dosage of Abilify was increased. (R. at 600, 602.) By December 5, 2008, this increased dosage had stopped Roseberry's hallucinations, and she was doing much better. (R. at 599.) On December 15,

-16-

2008, Roseberry reported doing much better since returning home from her sister's, noting that she went out at least twice weekly with her daughter. (R. at 598.) Her mood was euthymic with appropriate affect, and there was no evidence of psychosis. (R. at 598.) She was deemed clinically stable. (R. at 598.) On January 15, 2009, Roseberry reported doing well, noting only occasional depression and anxiety. (R. at 596.) Her mood was euthymic with congruent affect, and she was psychiatrically stable. (R. at 596.) SCMHS closed Roseberry's case on January 20, 2009, after she informed them that she had moved to Pulaski, Virginia with her sister. (R. at 594-95.)

Roseberry saw Nancy O'Neill, a family nurse practitioner at Free Clinic of Pulaski, on January 14, 2009, and again on February 6, 2009. (R. at 638.) O'Neill opined that GERD and panic attacks caused Roseberry chest pain. (R. at 638.) O'Neill also prescribed Lyrica. (R. at 638.)

Roseberry began treatment with Barrie Bondurant, Ph.D., L.P.C. at New River Valley Community Services on January 20, 2009. (R. at 641-45.) Bondurant diagnosed major depressive disorder, recurrent, moderate, with psychotic features; panic attacks with agoraphobia; and generalized anxiety disorder. (R. at 645.) Roseberry was referred for individual counseling and psychiatric treatment. (R. at 644.)

Roseberry continued to see Bondurant from February 11, 2009, through May 29, 2009. Over this time, she reported moderate anxiety and depression and insomnia. (R. at 638, 646, 647.) In March 2009, she reported feeling taken advantage of because her sister was allowing her to do all the cooking and

-17-

cleaning. (R. at 647.)  Bondurant encouraged Roseberry to move more, eat healthy, become more aware of negative thoughts, practice relaxation and attend a depression and anxiety group. (R. at 646-48.) Roseberry attended this group therapy session on April 7, 2009, and by May 29, 2009, she reported a stable mood for most of that week. (R. at 648, 695-96.)  She attended group therapy on June 19, and July 31, 2009. (R. at 697-98.)

On June 10, 2009, Roseberry continued to complain of pain in both hips and knees. (R. at 692.)  O'Neill provided financial forms for Roseberry to complete for a referral to the University of Virginia. (R. at 692.)  On July 22, 2009, Roseberry complained of left-sided neck pain that radiated into her shoulder. (R. at 692.) She had tense muscles on the left side of the neck and point tenderness on light to medium palpation. (R. at 692.)  O'Neill advised her to alternate heat and ice and rest in a comfortable position, and she prescribed ibuprofen. (R. at 692.)

Roseberry saw Angelia Berry, Psy.D., a licensed clinical psychologist, for a consultative psychological evaluation on September 9, 2009. (R. at 683-90.) Roseberry reported sleep and appetite disturbance, frequent sadness and crying, frequent worry, loss of interest in previously enjoyed activities, decreased motivation, feeling hopeless, helpless and worthless, anhedonia, isolation, nervousness, fatigue and decreased energy. (R. at 684.) She also noted that she experienced episodes of increased energy, decreased need for sleep and grandiose thinking and impulsivity, lasting for three days on average, and typically occurring three to four times per year. (R. at 684.) Roseberry also reported panic attacks, consisting of chest pain, difficulty breathing, sweating, hot and cold flashes and feeling closed in, lasting from 10 to 15 minutes. (R. at 684.) She reported an

-18-

inability to shop due to fear. (R. at 684.) Roseberry reported experiencing auditory and visual hallucinations for a period of two weeks approximately a year previously during a period of severe depression, but denied prior or subsequent hallucinations. (R. at 684.) She reported that she could take care of personal hygiene and prepare simple meals, as well as manage her finances. (R. at 685.) She stated that she spent her time engaging in light housework, watching television, listening to the radio and attending church twice weekly. (R. at 685.) She denied socializing outside of family members. (R. at 685.)

Roseberry was fully oriented with logical and coherent thoughts, normal motor activity and average fund of information. (R. at 685.) Short- and long-term memory was grossly intact, but working memory was mildly impaired. (R. at 685.) Her judgment and insight were adequate, she described her mood as "sad kinda," and her affect was slightly dysthymic. (R. at 685.) Berry administered the Minnesota Multiphasic Personality Inventory-2, ("MMPI-2"), which was deemed invalid due to overreporting of symptoms. (R. at 686.) However, Roseberry's self-report was consistent with medical records and, overall, was considered reliable. (R. at 686.) Berry diagnosed bipolar II disorder, most recent episode depressed; and panic disorder with agoraphobia. (R. at 686.) She assessed Roseberry's then-current GAF score at 62. (R. at 686.)

On September 30, 2009, Berry completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental) of Roseberry, finding that her ability to understand, remember and carry out instructions was not affected by her impairments. (R. at 688-90.) However, she found that Roseberry was moderately limited in her abilities to interact appropriately with the public and to respond

-19-

appropriately to usual work situations and to changes in a routine work setting. (R. at 689.) As support for these findings, Berry stated that panic symptoms may impair interactions with unknown others, and anxiety and depression symptoms were likely to significantly reduce coping skills. (R. at 689.)

When Roseberry saw Bondurant on October 28, 2009, she was still living with her sister, and she stated that she was depressed and anxious. (R. at 699.) Bondurant advised Roseberry to move and walk as much as possible to help with her depression and anxiety. (R. at 699.) Roseberry again attended group therapy on November 13, 2009. (R. at 700.)

On December 16, 2009, Bondurant completed a Mental Residual Functional Capacity Questionnaire, finding that Roseberry was either unable to meet competitive standards or had no useful ability to function at all in all mental abilities and aptitudes needed to do unskilled work. (R. at 701-05.) Bondurant supported this finding by stating that Roseberry's panic, anxiety and depression limited her memory, concentration and ability to sustain relationships, as well as her ability to learn and stay on task. (R. at 703.) Bondurant further opined that Roseberry was seriously limited, but not precluded, in her ability to set realistic goals or make plans independently of others, that she was unable to meet competitive standards in the areas of understanding, remembering and carrying out detailed instructions, and she had no useful ability to deal with stress of semi-skilled and skilled work. (R. at 704.) Bondurant found that Roseberry's ability to adhere to basic standards of neatness and cleanliness was limited, but satisfactory, that she was unable to meet competitive standards in interacting appropriately with the general public, maintaining socially appropriate behavior and using public

-20-

transportation, and she had no useful ability to travel in unfamiliar places. (R. at 704.) Again, Bondurant attributed these limitations to Roseberry's anxiety, panic and depression. (R. at 704.) She placed Roseberry's then-current GAF score at 50,[7] noting that she had been compliant with treatment, but had been slow to progress. (R. at 701.) Bondurant opined that Roseberry's impairments would cause her to miss more than four workdays monthly. (R. at 705.) She further found that her impairments lasted or could be expected to last at least 12 months and that Roseberry was not a malingerer. (R. at 705.) However, she found that Roseberry could manage her funds in her own best interest. (R. at 705.) Bondurant deemed Roseberry's prognosis as "guarded optimism." (R. at 701.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2011); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1250(a), 416.920(a) (2011).

---

[7] A GAF score of 41 to 50 indicates "[s]erious symptoms … OR any serious impairment in social, occupational, or school functioning. …" DSM-IV at 32.

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003, West 2011 & Supp. 2011); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980),

-22-

an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Roseberry first argues that the ALJ's residual functional capacity finding is not supported by substantial evidence because he failed to appropriately consider her pain and the effect her osteoarthritis and fibromyalgia would have on her ability to work and to use her hands. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 9-13.) For the following reasons, I find this argument unpersuasive. The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595. Protection of a claimant's power to establish the existence of disabling pain even without objective evidence of the pain's severity ensures the claimant only the opportunity to persuade the ALJ; it does not, obviously, ensure a favorable result for the claimant. "[S]ubjective evidence of pain cannot take precedence over objective medical evidence or the lack thereof." *Parris v. Heckler*, 733 F.2d 324, 327 (4th Cir. 1984). The ALJ may use objective medical evidence in evaluating the intensity and persistence of pain.

-23-

In *Craig*, 76 F.3d at 595, the court stated:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers …

To hold that an ALJ may not consider the relationship between the objective evidence and the claimant's subjective testimony as to pain would unreasonably restrict the ALJ's ability to meaningfully assess a claimant's testimony. Evidence of a claimant's activities as affected by the pain is relevant to the severity of the impairment. *See Craig*, 76 F.3d at 595.

Furthermore, an ALJ's assessment of a claimant's credibility regarding the severity of pain is entitled to great weight when it is supported by the record. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984). As in the case of other factual questions, credibility determinations as to a claimant's testimony regarding her pain are for the ALJ to make. *See Shively*, 739 F.2d at 989-90.

Here, the ALJ found that Roseberry's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but he found her statements regarding the intensity, persistence and limiting effects of these symptoms not credible to the extent that they were inconsistent with his residual functional capacity finding. (R. at 22.) In making this finding, the ALJ noted Roseberry's activities of daily living, which included living independently,

-24-

cooking, cleaning, dressing herself and attending church services twice weekly when able. (R. at 22.) The ALJ further noted that the evidence did not show that Roseberry demonstrated any observable manifestations of severe chronic pain, including weight loss due to loss of appetite caused by incessant pain, weight gain due to inactivity from pain, muscular atrophy due to muscle guarding, muscular spasms, the use of assistive devices, prolonged bed rest or adverse neurological signs. (R. at 22.) The ALJ also noted that Roseberry was not then-currently engaged in physical therapy or biofeedback, nor did she use a TENS unit, a dorsal stimulator, a morphine pump, acupuncture, massage therapy, braces or splints, special creams or ointments, herbal remedies or chiropractic adjustments for pain relief. (R. at 22.) Finally, the ALJ noted that the state agency physicians' findings were inconsistent with Roseberry's allegations of disabling pain. (R. at 24.) In June 2007, state agency physician Dr. McGuffin opined that Roseberry could perform light work that required no more than occasional postural movements. (R. at 399-405.) He imposed no manipulative, visual or communicative limitations, but found that Roseberry should avoid all exposure to hazards. (R. at 401-02.) In March 2008, state agency physician Dr. Duckwall made identical findings. (R. at 503-10.)

It is for these reasons that I find that the ALJ properly analyzed Roseberry's allegations of pain and its effect on her ability to work. It also is apparent that the ALJ specifically considered Roseberry's bilateral hand impairment. The ALJ noted Roseberry's testimony that her osteoarthritis caused loss of grip bilaterally. (R. at 21.) The ALJ also noted the October 2007 x-rays showing *mild* osteoarthritis of the hands. (R. at 22.) Additionally, as stated above, neither state agency physician imposed any manipulative limitations on Roseberry. (R. at 401, 505.) Roseberry

-25-

also reported taking care of her sister for a period of time, including cooking and cleaning and bringing her things. (R. at 604, 647.) She described housework as a stress reliever, and in August 2007, she reported washing the outside of the windows of her home. (R. at 424, 609-10.) These activities simply are not consistent with Roseberry's allegations of a disabling bilateral hand impairment.

It is for all of these reasons I find that substantial evidence supports the ALJ's pain analysis and analysis of Roseberry's symptoms resulting from fibromyalgia and osteoarthritis of both hands.

Roseberry also argues that the ALJ erred by failing to accord proper weight to the opinions of her treating sources, Dr. Ghaith Mitri, M.D., a rheumatologist, nurse practitioner Swihart and counselor Bondurant. (Plaintiff's Brief at 13-19.) However, I find that substantial evidence supports the ALJ's weighing of the evidence. Apparently, Roseberry contends that the ALJ erred by failing to accord proper weight to Dr. Mitri's finding that she would likely need to apply for disability benefits if her fibromyalgia-related problem persisted, as there were no disease-modifying drugs or any curative type medications for it. (R. at 323-24.) There are two distinct problems with this argument. First, Dr. Mitri's opinion regarding whether Roseberry may or may not be disabled is not entitled to any weight, as the issue of disability is reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e), 416.927(e) (2011). Second, Dr. Mitri treated Roseberry from June 2005 through August 2005, and the above-stated opinion was rendered after seeing Roseberry for a follow-up visit on August 16, 2005. As such, this opinion is not within the relevant time period for this court's review.

-26-

As for Swihart, she completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical) on October 23, 2007, finding that Roseberry could lift and carry items weighing less than 10 pounds occasionally and less than five pounds frequently, that she could stand and/or walk for a total of one to two hours in an eight-hour workday, but for only 30 minutes at a time, that she could sit for a total of one to two hours in an eight-hour workday, but for only 30 minutes at a time, that she could never climb, stoop, kneel, balance, crouch or crawl, that reaching, handling, feeling and pushing/pulling were affected by her impairments and that she was restricted from working around heights, moving machinery, temperature extremes, noise, humidity and vibrations. (R. at 501-02.) The ALJ accorded this opinion no weight for two reasons. First, it was rejected because Swihart, as a nurse practitioner, is not considered an "acceptable medical source." (R. at 23.) Second, the ALJ found it inconsistent with the objective evidence. (R. at 23.)

While it is true that Swihart is not an "acceptable medical source" under the regulations, that is not sufficient, in and of itself, to reject her findings outright. *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2011); *see also* 20 C.F.R. §§ 404.1513(a), 416.913(a) (2011). Although no weight may be given to Swihart's opinions regarding the *existence* of any impairments, as an "other source," she may render an opinion regarding the *severity and effect* of Roseberry's impairments on her ability to work. *See* 20 C.F.R. §§ 404.1513(d), 416.913(d) (2011). The weight accorded to such an opinion from an "other source" depends on factors such as whether Swihart provided an explanation to support her findings, whether the findings are supported by medically acceptable clinical and laboratory techniques and whether the findings are consistent with the other substantial evidence of

-27-

record. *See* 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6) (2011). In this vein, the other basis for the ALJ's rejection of Swihart's findings was its inconsistency with the objective evidence of record. For the reasons that follow, I find that the ALJ's rejection of Swihart's findings is supported by substantial evidence.

In particular, I find that Roseberry's self-report of activities of daily living contradict such stringent restrictions imposed by Swihart. For instance, in May 2007, Roseberry reported being able to complete all activities of daily living and independent living with no intervention. (R. at 465.) In June 2007, Roseberry reported living alone, having no difficulties with personal care, preparing light meals daily and shopping every two weeks. (R. at 228-35.) In September 2007, Roseberry again stated that she had no difficulties with personal care and that she prepared light meals daily. (R. at 253-54.) She also reported that she vacuumed twice weekly when she could, did laundry once weekly and washed dishes, depending on how she felt. (R. at 254.) Roseberry consistently reported cleaning her house as a form of stress relief. (R. at 609-10, 618.) In September 2008, she reported moving in with her sister to care for her after she underwent open heart surgery. (R. at 604.) In March 2009, she informed Bondurant that she felt as if her sister was taking advantage of her because she was performing all of the cooking and cleaning. (R. at 647.) As recently as September 2009, Roseberry reported preparing simple meals, managing her finances, performing light housework, watching television, listening to the radio, attending church services twice weekly and socializing with family members. (R. at 685.) Additionally, no other treating source imposed any limitations on Roseberry's activities, and the state agency physicians found in June 2007, and again in March 2008, that she could perform

light work with occasional postural movements and no exposure to hazards. (R. at 399-405, 503-10.)

It is for all of these reasons that I find that substantial evidence supports the ALJ's rejection of Swihart's October 23, 2007, physical assessment.

Next, Roseberry argues that the ALJ erred by rejecting the opinion of counselor Bondurant. Again, I disagree. In a December 16, 2009, mental assessment, Bondurant found that Roseberry had either no useful ability to function or was unable to meet competitive standards in 23 of 25 mental functional categories. (R. at 703.) Bondurant placed Roseberry's then-current GAF score at 50. (R. at 701.) She noted that, while Roseberry had been compliant with treatment, she had been slow to make progress. (R. at 701.) Bondurant further opined that Roseberry would be absent from work four days monthly due to her impairments or treatment therefor. (R. at 705.) Bondurant based her opinions on Roseberry's panic, anxiety and depression, which limited her memory, concentration, ability to have relationships and ability to learn and stay on task, as well as inhibiting her ability to deal with stress and interact with others. (R. at 703-04.) The ALJ stated that he was giving Bondurant's opinion very little weight because her conclusions were inconsistent with the treatment notes, the level of treatment received and Roseberry's activities of daily living. (R. at 24.)

Bondurant's own treatment plan was inconsistent with her imposed limitations, as it was conservative in nature, including medication management, case management and advice such as moving more, eating healthy and becoming more aware of negative thoughts. (R. at 646.) Bondurant also recommended that

-29-

Roseberry attend a depression and anxiety group, which she did. (R. at 646.) Despite Bondurant's restrictive findings, Roseberry was repeatedly described by treating sources at SCMHS as clinically stable on May 4, May 14, June 6, July 2, August 29, September 27, October 24, October 29, November 21, and December 20, 2007, and January 29, February 18, March 3, March 17, May 22, June 19, July 14, August 11, September 29, October 10, November 13, and December 15, 2008. (R. at 437, 441, 445, 452, 456, 459, 598, 602-04, 608-10, 613, 618-20, 622, 624-25, 627.) She received GAF scores ranging from 55 to 60 during her treatment at SCMHS, indicating moderate symptoms. (R. at 448, 457, 492.) Roseberry also received no more than conservative treatment, including medications and case management from SCMHS. She reported never having been psychiatrically hospitalized in the past, nor did any treating mental health source deem inpatient treatment necessary during the relevant time period. After trying different medication combinations and dosages, Roseberry reported that her mental symptoms were helped or controlled. (R. at 440, 442-43, 599-600, 604, 611, 615, 619-21, 627.) Next, Roseberry's activities of daily living, as cited above, undermine such restricted findings by Bondurant. I note that despite having some instances of auditory and visual hallucinations, she reported in October 2007 that medication had helped. (R. at 437-41, 444-45, 452, 460, 470, 491, 627.) Over her course of treatment with SCMHS, Roseberry also was consistently found to show no evidence of psychosis. (R. at 456, 598, 602, 608-11, 615, 620, 622-24, 627.) Lastly, Bondurant's findings are inconsistent with those of the state agency psychologists. In June 2007, state agency psychologist Leizer found that Roseberry was only mildly limited in her activities of daily living, experienced mild difficulties in maintaining social functioning, as well as in maintaining concentration, persistence or pace and had experienced no episodes of

-30-

decompensation. (R. at 406-19.) Similarly, in March 2008, state agency psychologist Jennings found that Roseberry was only mildly limited in her activities of daily living, experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 511-25.) Jennings also opined that Roseberry was not significantly limited in the majority of work-related mental abilities. (R. at 526-27.)

Based on the reasoning stated above, I find that substantial evidence supports the ALJ's weighing of the evidence and his resulting residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the Commissioner's weighing of the evidence;

2. Substantial evidence exists to support the Commissioner's residual functional capacity finding; and

3. Substantial evidence exists to support the Commissioner's finding that Roseberry was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Roseberry's motion for

summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2011):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     February 15, 2012.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-32-

-33-